Good morning, and may it please the Court, my name is Attorney Michelle Moretti for Appellant Jeffrey Feingold. He was a naturopathic physician in Arizona and appealing the conviction and sentence on 185 counts of illegal distribution of a controlled substance under the Controlled Substances Act. The argument is basically split into the substantive sections under the CSA and the sentencing factors. I would like to address the substantive arguments first, if I may. The main argument is that Dr. Feingold was deprived of a fair trial and due process of law when the trial prosecutor repeatedly elicited medical standard of care testimony to prove his intent to violate the CSA. Along with that, the judge improperly violated the criminal standard in the course of professional practice with the negligent standard good faith compliance with the generally accepted medical consensus in the country, despite a lack of articulated medical consensus in this country at this point. Well, counsel, it's certainly clear that there has to be some standard against which your client's conduct is measured. Is that not correct? Yes, Your Honor. But the mens rea required under the conviction for criminal prosecution or prosecution for criminal conviction in this case is a very high one. Now, in the past, the courts have allowed prosecution of physicians under this statute, but only the most egregious examples. Here, Dr. Feingold was a duly licensed practitioner with both Arizona State authorization and DEA authorization to prescribe these substances. But isn't the evidence quite clear that he was prescribing in amounts clearly in excess of what the individual could use during any given period? And he prescribed for people whom he didn't know, who weren't before him. I mean, there's just a great deal of evidence that whatever he did was far beyond whatever standard you want to set. Well, the issue was the judge's instruction that he did not follow the good faith practice generally in good faith practice generally accepted in the country. As to the evidence that was admitted at trial, it was controverted, actually. There was evidence from pain management specialists, and there's evidence in the record, in the supplemental record, that, for instance, there is no upper limit on opioids. The proper remedy for pain treatment is adequate titration. The American Association of Physicians and Surgeons, who submitted a letter, which I've included in the supplemental record, specifically said there is no set standard of office visits, of a procedure, or anything specifically delineated to articulate what is in the course of professional practice. So what you're saying, then, is that there is no way that he could have violated any standard because there is no standard? Recently in the Supreme Court case of Gonzales v. Oregon, the Supreme Court specifically articulated that there is no generally accepted American or standard in the country for a problem with the terms legitimate medical purpose and in the course of professional practice. The legitimate medical purpose language actually derives from the rule, which served to explain the meaning of the statute. But in any case, the court found those two fragments of language vague and ambiguous in the relevant sense, as I've cited in my supplemental authority to the court. I wasn't dealing with the situation we have here. That was the physician-assisted suicide and the attorney general intruding into Oregon's death with dignity regime. They didn't confront the issue here. So I come back to my question. I think Gonzales answers it. So I'd like your view. Is your position that you cannot prosecute any physician under the CSA because there is no standard against which to measure a physician's dispensing of controlled substances? The position is actually that a physician could be prosecuted under the extreme case, but not for violation of traditional medical malpractice criteria. That criteria, standard of care evidence, as delineated in the brief, should be wiped out. The government should have been required to make its case on the credibility of the allegation only of drugs for profit in this case. All right. Now, if the ‑‑ let's assume the evidence suggests that the physician, intentionally, committed malpractice. Let's assume that that's what the evidence says. Would that meet your standard? Absolutely not, Your Honor. Malpractice is a civil criteria, and it does not include the crucial element of mens re, of criminal scienter, for a conviction under a criminal statute with such draconian penalties. This man is serving 144 months in a federal prison after having been caught up in a flurry of legislative changes and ambiguities, and an era where the government of the United States, under the auspices of the DEA, sought to encroach upon something, a medical practice or standards of medical practice or types of pain control management that have been traditionally left to states' regulation. But, counsel, there may be some difficulties in determining what the standard should be and what the mens rea should be, but the evidence here against your client is so overwhelming. If you were to go case by case by case, as we have looked at in the record, including the subscriptions for undercover agents who were told they, one of them I guess was prescribed for without even being there, and they were told to go to different pharmacies to get them filled. As I've articulated in my brief, Your Honor, there was an explanation for all of that. There were 185 counts here. The prescriptions to the DEA agents were, constituted only seven of them. Dr. Feingold testified, and so did his other patients, that he advised them to go to a different pharmacy because physicians or pharmacists did not want to fill naturopathic prescriptions because they didn't believe they were legitimate doctors. Both Dr. Feingold and the patients testified to that at some point in the record. As to prescribing for people unseen, it was testified to that in a naturopathic practice that is not unheard of. There's a different ethic, a different standard. I'm almost loathe to use the word standard, but a different way of prescribing in that style of practice. As to the amount of controlled substances, I would point out to the Court that in almost every case, the amount per pill was very, very small. And I would, again, the literature, medical literature submitted in support suggests that, and testimony also, there was evidence to suggest that patients can take much larger doses, but in different forms. Dr. Feingold testified that he prescribed many pills in most, almost all of whom had objectively confirmable medical problems. It was undisputed that these substances were always prescribed for pain. In almost every instance, the patient came in and very often badgered Dr. Feingold, but said that the substances in question had previously been prescribed by other doctors. Dr. Feingold knew that one could continue taking these substances and achieve a tolerance which is very distinct from an addiction, and tolerance is a very normal consequence of use, of repeated use of narcotic drugs to treat pain, because one becomes tolerant, does not contraindicate the use of pain medication. To suggest that would be to deprive many people in dire need of this medication. It is not synonymous with addiction, and that was also discussed in the record as well. Do you want to have more, or do you want to reserve your time? Actually, if your honors wouldn't mind, I'd just like to quickly distinguish the case provided by my sister, the Illary case, which was decided pre-Gonzalez in December. In that case, the defendants or the appellants did not challenge the sufficiency of the evidence or the jury instruction, both of which are challenged in this case. We're submitting that the instruction itself, including the language generally accepted medical standard in the country, is now – it renders everything constitutionally infirm. It is now constitutionally infirm. It has the effect of rendering the statute as applied in this case void for vagueness, rather, and it results in denial of Mr. Feingold's due process rights. Further distinction, the Court in Illary noted that there was a careful jury instruction given to the jury regarding the civil versus criminal standards of care. That was not done in this case. In fact, it's the opposite. And finally, in that case, the prime – in terms of the prejudice, the prime prejudice was – there was less prejudice, actually, because the prime witness was a turncoat informant who had masterminded the whole plot and then corralled his colleagues and testified in it. So he testified that. Basically, he corralled them into what was clearly an illegal prescribing practice, and there were all sorts of health fraud and money laundering charges involved in that case as well, which are not the case here. So the analysis is very different, Your Honors, and I would suggest that it's a distinction that is worthy of mention. As to the second portion of the argument, as I mentioned, Dr. Feingold has received a sentence of 144 months. At trial, the jury returned general verdicts and found him not guilty of the bodily injury component, but trial counsel argued that any enhancements which would increase Dr. Feingold's sentence should be argued and proven to the jury under the Apprendi-Blakely standards. Here, the jury made no specific findings as to the quantities involved. Trial counsel argued that this should have resulted in a base offense level of 12 instead of 30, which would have been a 10- to 16-month range under the guidelines, as prescribed by what turned out to be a level 32. Is your client interested in an amyline limited remand? If we don't buy the other arguments, but in other words, on sentencing, if we get to that point, does he desire a remand for consideration under discretionary guidelines? Yes, certainly, Your Honor. Dr. Feingold would, at this point, request a remand for resentencing, a full remand, or a full remand. I understand that. I'm not asking you to concede anything on the conviction. Or even the limited remand, of course. But again, as to the Blakely issue, I think Booker is self-evident. Here, it appears that in convicting Dr. Feingold of the 185 counts, the jury necessarily found that Dr. Feingold distributed both the type and the amount of the controlled substance, or at least that was the judge's argument in justifying this, and also that they necessarily determined that he used his skills and his DEA certification to facilitate the commission of the crime. Notwithstanding, the evidence against him was circumstantial, and even the expert witness, Dr. Ferrante, could not tell whether certain of the prescriptions were legitimate or illegitimate based on his chart review. So of all the 185 prescriptions that were written, he was sentenced. He received a penalty for every gram, every ounce. There was a pre-sentence report, was there not? Yes, Your Honor. And a hearing at the time of sentencing, and challenges made to the points in the report. So all of this has been gone over, hasn't it? It's preserved in the record, and just one final point on this. The jury likely issued the blanket verdict based on the medical standard of care evidence in this case. They did not find the specific quantities involved, and this sentence has a disproportionate effect, which is the very ill that Blakely's jury fact-finding requirement. I didn't bring with me today the actual instructions given in this case, and I wondered if there was an instruction conference before the instructions were given, and if your point about the defect in the instruction on mens rea was brought out and hammered out in the conference. Yes, Your Honor. And as I've mentioned in the brief, the trial counsel did request that, request an instruction on the, again, on the criminal versus civil, criminal standard, civil standard of proof. The judge agreed to give it, but ultimately did not. It did not come out in the instructions. Furthermore -- Was an exception taken at that point? Not at that point, but it had, it appears to have just gotten lost in the Herman-Burman. Are you claiming plain error on the, all right. Not at this point, but since jury instructions are so crucial, the importance of that is self-evident. But just if I can find my place for a moment in getting back to the jury and getting back to that argument. Take your time. You may want to save some time for rebuttal. Thank you, Your Honor. I'll save the remainder of my time for rebuttal. May it please the Court, Linda Boone on behalf of the United States. The opinion of one man cannot create a standard or policy decision for the medical community, especially when he is untrained in that field. That is the lesson that we take from the Supreme Court's opinion recently cited by my opposing counsel of Gonzalez v. Oregon. Although there is a subjective opinion to the issue of Defendant Feingold's good faith, the Supreme Court case underscores that a man who is admittedly untrained in the field and in Defendant Feingold's case, a man who made no attempt to obtain such training, cannot be the one whose standard decides the case. So what is the standard? How does the standard get identified for prescription of controlled substances? The standard is identified, Your Honor, by what is established by the medical community as being generally recognized in the usual course of a professional practice. And the government submitted evidence of what those standards were through two medical experts. This was not ñ I'm sorry, Your Honor. Well, I'm just ñ I understand that there were ñ there was what looks like a malpractice standard applied. So how ñ what's the ñ I'm having a little trouble getting my hands around how malpractice becomes criminal. Your Honor, the opposing counsel has attempted to confuse the civil malpractice standards with the criminal standards of proof. That is not what happened in this case. This Court in Fetcher ñ I'm not sure if that's how you pronounce it correctly ñ explained that evidence that a doctor repeatedly failed to follow the generally recognized medical procedures tends to show that he was not prescribing controlled substances for a legitimate medical purpose. The Fourth Circuit in O'Leary also held that. And so what the government did, and the government did it very specifically, is they submitted testimony from a naturopath who had attended the very same medical college as Defendant Feingold, and also from a pain management specialist. And these two doctors established that there were, in fact, guidelines for the distribution of controlled substances for pain management, and that evaluation, physical examinations, medical history, diagnosis, treatment plans, and periodic reviews were the standards. Maybe so. That's helpful. But then what makes it criminal as opposed to civil malpractice? What makes it criminal, Your Honor, is that not only did the defendant in this case not follow those standards, but that he repeatedly did not follow those. And when given specific information such as, ìDoctor, I've been addicted to these drugs.î It didn't stop him from when he was advised by pharmacists, more than one, from more than one pharmacy, ìWe've got an issue, a question, about the amounts and the frequency of the drugs that you're prescribing.î He ignored those and went right on prescribing as he had in the past. And also, Your Honors, the Court specifically noted, and in its sentencing Well, no, let's not get to the sentence. Let's get to the jury. You've told me sort of what the evidence is. What's the jury? You've told me what the standard testified to. But then how was the jury supposed to determine the breakpoint between civil malpractice and criminal culpability? Because the district court specifically advised them with the instructions on specific intent and good faith. And as this Court, and it used, quoted the exact good faith jury instructions from Hayes, which this Court approved, and specifically said, I don't want to make a mistake on this, that the instructions on good faith and specific intent with those instructions to permit a finding of guilty based on mere negligence, which is the civil standard. That is this Court's own holding in Hayes, Your Honors. So I would submit, therefore, that the district court followed the law, followed the standards, and correctly instructed the jury. And also, Your Honors, the record is clear that the defendant himself, and I'll point you to ER pages 109 to 110, and the government's brief at page 15, where these are found. The government's, excuse me, the defendant's own expert, Dr. Cronin, and the defendant himself, agreed and admitted that the defendant's practice, his methods of prescribing controlled substances, was outside the usual course of accepted practice by his own admissions, Your Honor. And let us not forget, and the district court found this crucial, Dr. Ferrante, who was the pain management specialist, testified that the amounts of controlled substances prescribed were so great that if the patients had taken them in the short periods of time in which they were prescribed, that those patients would have died from liver failure. We cannot ignore those facts, and those facts were not contradicted on the record. If the Court has no further questions on that, I'd like to move on to the sentencing. The defendant's first contested issue on sentencing, the Blakely error, excuse me, Your Honors, must fail because the defendant was not sentenced based on facts not found by the jury verdict, or specifically admitted by the defendant. The district court went to the extraordinary measure in that Booker was a huge subject of controversy at the time. It had just been made a record at the sentencing hearing, but subsequently submitted a detailed written sentencing report so that this Court could have the benefit of as much detail as possible of its thinking. And in that sentencing report, the district court went to the extra effort of specifically pointing out exactly where the defendant had made the admissions. The evidence submitted by the government included specific patient records from each patient which applied to each of the counts on the indictment, obviously other than the ones that were dismissed. And each of those records contained detailed drug logs. And each of those records contained detailed drug logs. How much and when. Defendant Feingold did not contest or challenge any of those amounts or any of those substances at all. So in finding that the defendant was guilty of each of those counts, and by the jury, and with the defendant's own admissions, the district court did not have to make any factual findings itself. They were there. So the sentencing enhancements. Could you address the safety valve issue? Yes, absolutely, Your Honor. That is a little more difficult. It's not as clear-cut as the Booker and Blakely error. However, the government does concede that it was error. It appears that the weight of legal authority finds that a mandatory minimum sentence is not required to apply the safety valve. And, of course, the Court is aware that that was a misnomer. It wasn't exactly the safety valve. It was rather a section under the guidelines which is now 2D1.1b7, but was b6 at the time. But it required application of the criteria for the safety valve provision. Now, although the government concedes that this was error, the government does not concede that remand is necessarily and automatically required for this error. And that is because, as we know, for post-Booker sentencing review, we do apply the ordinary prudential doctrines, and we look to see whether harmless error is an applicable analysis in this case. The government would submit that we do have the record of the district court, which establishes that the district court did not agree that even if it was wrong and that a mandatory minimum was not required, the court did not agree that the defendant had met the applicable criteria. And it is clear on the United States v. Shrestha that the court did not agree that at several times, that I don't extract the clarity that you do. So can you point me to where he... Absolutely, Your Honor. At ER 344 and 350-352, we just fill that out, Your Honor. Wait, wait, wait. Take your time. Don't talk from back there. We need you on the mic. You're being taped. I don't want to hold you up. No, you're being taped for posterity. Yes, I know that. Your Honor, the district court and defense counsel were discussing whether or not the defendant... I've got it here. I just wanted to know how you interpret it. How I interpret it? Yeah. Oh, certainly, Your Honor. It's clear. The district court says at page 352... Well, let's get to 351 first. I mean, let's keep it in context. What's the... Your Honor, if I am incorrect... Incorrect about what? This is court speaking in line 14, and I could be, this is the court, I find that even though your advocacy has suggested that I should have taken it into account, I choose not to do so because I don't think he, and then the court lost something on the tape, that last factor of that, so the last factor, there's five factors, so we're at the last... No, no. Wait a minute. Wait a minute. It says if I'm correct, and I could be... If I'm incorrect. I find that even if, even though your advocacy has suggested that I should have taken into account, I choose not to do so because I don't think he, and the last factor of that being candid with the court, I've given him acceptance of responsibility, which is not the safety valve, right? No. No, Your Honor. It's not. So he says, no, you haven't, Your Honor. I'm sorry, I did not. I apologize. He does not get that, does not get acceptance of responsibility, right? Yes, Your Honor. Because... But as you go on... All right, so... They're continuing, and defense counsel says he has met the criteria, Your Honor, and on to the next page, the court says... Under the safety valve, he has met the criteria. Yes, that's what the defense counsel says, and the court says, I respectfully disagree. Yes, but his basis for that is that there was no mandatory minimum here. Yes. Right, so are you interpolating what he talks about on the acceptance of responsibility into what he's talking about when he says, I respectfully disagree? He is including that, Your Honor, because when the defense counsel says, under the safety valve, he has met the criteria, Your Honor, the court says, I respectfully disagree. And if you go down to, you know, defense counsel then talks again and says, he should be entitled to the two-level reduction, the court says, and if I am incorrect that it could apply, I do not believe it is applicable in this case for the reasons that I've stated. And so that's why you have to go back to page 351 at ER where the court was saying, referring to the last factor of that, but then the, unfortunately, defense counsel cut him off, and so the court never got to say exactly why he didn't think defense counsel, excuse me, defendant had met the fifth criteria, the last one. But the court clearly indicated that, first of all, he didn't think the mandatory minimum was, excuse me, that the mandatory minimum was required, but that if he was wrong and that it was not required, nevertheless, it was the court's opinion that defendant Feingold was not eligible. For those reasons, Your Honor, we would submit that there is a record there from which the court, this court, could find that the defendant has not established the prejudice and, in fact, it is the defendant's burden to prove by preponderance of the evidence that he is entitled to that departure. Do you agree that there should be a amyline limited remand here? Your Honor, the – obviously, the law says that the defendant is entitled to such a record, but it's the government's position that you need not remand because the record is sufficient and clear in this case on sentencing. That he would have gotten the same sentence, even if the guidelines were? Even if the guidelines were different. And where do we find the evidence of that? The evidence, Your Honor, is in the record on sentencing and in the written sentencing in a supplemental memorandum that the district court prepared in which he gave the reasons why he denied every request for downward departure for defendant Feingold. And he also noted that he was particularly struck and would never forget, I'm paraphrasing the district court, that this defendant said he believed he had found a good way to make money and would have a profitable practice in the area of pain management. And the government submits, Your Honor, that's exactly the proof of his intent. Okay. If the court has no further questions, I thank you. Thank you. We don't? Thank you, Your Honor. Addressing the last point first, we're all in business to earn a living. Dr. Feingold's income was modest. And the fact that he derived some sort of modest living from his practice is not sufficient to have deemed him a drug dealer on a large scale for purposes of conviction under the statute. As to the safety valve or 2D1.1 reduction under the safety valve criteria, although the judge cursorily stated that Dr. Feingold didn't meet the criteria for the reduction, the record doesn't disclose that he actually considered the matter to the extent that he so found it was clearly erroneous. If he was considering the last factor, candor to the tribunal, it appears that the judge may have been penalizing Dr. Feingold for exercising his right to trial. As to Judge Goodwin's questions about the jury instruction, the prejudice was not mitigated by the adequate and timely instructions to the jury. Prior to deliberations, the judge denied counsel's request to instruct the jury that in making a medical judgment concerning the right treatment for an individual patient, physicians have the right to choose among a wide variety of options. Furthermore, during the final charge, although trial counsel had requested and the judge previously agreed to instruct the jury that failure to follow a standard of care of a reasonably competent physician does not rise to the level of criminal liability, no instruction was omitted. The jury was not sufficiently alerted to the fact that it must find or make a subjective inquiry or an inquiry into the subjective state of Dr. Feingold's mind to find the required mens re for a conviction under the statute. And finally, two other points regarding the standards that were purportedly offered, standards of pain management or medical practice. The naturopathic physician proffered by the government did not attend the College of Naturopathic Medicine in Oregon at the same time as Dr. Feingold. He attended many, many years later. And as to Dr. Feingold's prescribing pain mitigation for people who were otherwise drug-addicted, the authority is contrary. The authority provided in conjunction with this suggests that addiction does not necessarily indicate or contraindicate prescription of pain medicine for those who reasonably need it. If the Court has no further questions, I will submit. All right. Fine. Thank you. Counsel, we appreciate your arguments, and the case argued is submitted.
judges: Goodwin, B.fletcher, Fisher